**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

EDWARD GIEBUDOWSKI,           )
           Plaintiff-Claimant,      )
                         )    No. 11 CV 50070
v.                          )
                         )    Iain D. Johnston
CAROLYN W. COLVIN, Acting Director  )    Magistrate Judge
Commissioner of Social Security,     )
           Defendant-Respondent.  )

### MEMORANDUM OPINION AND ORDER

Edward Giebudowski (hereinafter, "Claimant") brings this action under 42 U.S.C. §405(g), seeking reversal or remand of the decision by Respondent, Carolyn W. Colvin,[1] Acting Commissioner of Social Security ("Commissioner"), denying his application for disability insurance benefits under Title II of the Social Security Act ("SSA"). This matter is before the Court on cross-motions for summary judgment.

The Claimant argues that the Commissioner's decision denying his application for benefits should be reversed or remanded for further proceedings because the Administrative Law Judge's ("ALJ") decision is not supported by substantial evidence and is contrary to law. The Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence. For the reasons set forth more fully below, the Claimant's motion for summary judgment is granted in part and denied in part, and the Commissioner's motion is denied. The matter is remanded.

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

# I. BACKGROUND

## A. Procedural History

The Claimant filed an application for disability on January 17, 2006, alleging a disability onset date of August 13, 1999, due to a back injury, degenerative disc disease, buttock and leg pain, numbness, and high blood pressure. R. 147, 157. The application was denied on May 1, 2006. R.100. The Claimant filed a request for a hearing on December 19, 2006. R. 112. Although the ALJ concluded that the request was untimely, she found good cause for allowing the untimely filing and conducted a hearing on September 19, 2008, in Orland Park, Illinois. R. 14. The Claimant, his wife, and Vocational Expert Thomas Grzesik testified at the hearing. R. 28.

On March 25, 2009, the ALJ issued a decision denying the claim for benefits. *Id.* The Claimant filed a timely request to review the ALJ's decision, but it was denied making the ALJ's decision the final decision of the Commissioner. R. 1-4. Thereafter, the Claimant filed this appeal pursuant to 42 U.S.C. §405(g).

## B. Hearing Testimony

### 1. Claimant

The Claimant proceeded *pro se* at his hearing on September 19, 2008. R. 31-32. He testified that he had worked as an outdoor laborer until August 13, 1999, when an accident at work aggravated previous back injuries. R. 41-42. Although he had two surgeries to repair his earlier back injuries, doctors did not want to risk a third surgery because of scar tissue that had developed near his sciatic nerve. R. 42. Instead, the Claimant participated in a work hardening program to rebuild his strength. R. 43. However, he had difficulty climbing ladders and stairs, lifting more than 10 or 15 pounds, or walking any more than short distances, and so he "flunked

out" of the program after 6 weeks.  R. 43.

The Claimant testified that in addition to continuing back pain, he also suffers from (1) hammertoe on his right foot that prevents him from taking a full stride, affects his balance, and causes pain, R. 51, (2) a noncancerous lymphoma on his neck that rarely causes headaches, R.52, (3) a problem with his left hip point that causes pain, R. 53, and (4) a problem with his rotator cuff that also causes pain, R. 54.  He testified that after the 1999 injury he received injections that alleviated the pain for a couple of months, but the pain always returned.  R. 55-56.  At the time of the hearing, he used Vicodin, Lyrica, and oxycodone to control his pain.  R. 60-61.

The Claimant testified that in 2004, he would help around the house with housecleaning such as vacuuming and laundry, light shopping and yard work, and would help care for his newborn grandson.  R. 63-64.  His hobbies included playing guitar and building model airplanes. R. 64-65.  However, he needed to alternate sitting and standing while building the airplanes, and would eventually have difficulty maintaining his concentration and need to lie down.  R. 71-72. He also had difficulty finishing a song on his guitar.  R. 71.  He testified that he must alternate between sitting, standing, and walking about every 30 minutes or else his legs go numb.  R. 67. The Claimant also described an incident in 2003 when he used an ax to chop a pallet for firewood, but overshot the pallet and injured his elbow.  R. 77-78.

### 2.    Claimant's Wife

The Claimant's wife also testified at the hearing.  She testified that her husband would sometimes cut wood using a 16-pound electric chainsaw.  R. 78.  She also testified that he spent about 80 percent of the past 10 years lying down.  R. 83.

### 3.    Vocational Expert

Vocational expert Thomas Gressick also testified at the hearing.  The ALJ presented Gressick with the following hypothetical:  an individual the Claimant's age, education level, and work experience, who could perform light work with a sit/stand option that allowed him to change positions once an hour who could do occasional overhead reaching, frequent forward reaching, and simple routine tasks that involved simple instructions.  R. 91.  According to Gressick, this hypothetical person could perform 4,000 jobs as a production assembler, 3,000 jobs as a small products assembly, and 500 jobs as an electronics worker in the region.  R. 92.  Gressick testified that the jobs available would not change even if lifting were limited to a maximum of 15 pounds, and standing was limited to a total of 4 hours per day, alternating positions once every hour.  R. 93.  However, Gressick testified those jobs would not be available if the hypothetical person could stand for a total of only 2 hours or could reach forward only occasionally.  R. 93-94.

### C.    Medical Evidence

The Claimant injured his back while working as a mechanic in 1986, underwent a laminectomy at L4-5 performed by Dr. Robert Kazan, and after rehabilitation returned to work 6 months later.  R. 424.  In 1993, he re-injured his back at work, Dr. Kazan again performed surgery, and after rehabilitation returned to work about 6 months later.  R. 424.  In 1999, the Claimant again injured his back at work while cleaning a sewer.  R. 424.  An MRI of the lumbar spine dated September 8, 1999, revealed mild disc herniation at the L3-4 level that was minimally larger than noted in 1991 and produced mild spinal stenosis.  R. 385.  The MRI also revealed recurrent disc herniation at L5-S1 probable with foraminal narrowing.  R. 385.  On November 10, 1999, a lumbar myelogram revealed mild bulging at L3-4 and moderate

degenerative disc disease at L5-S1.  R. 424.

On July 14, 2000, Claimant sought treatment for back pain from Dr. Gary Koehn.  Dr. Koehn noted that an EMG revealed right L5-S1 spinous denervation without radiculopathy.  R. 209.  According to Dr. Koehn's notes, Claimant reported back and lower extremity pain with radiation to the foot.  R. 209.  An exam revealed positive straight leg raising accentuated by ankle dorsielexion, but motor, sensory, and touch exams were symmetric.  R. 209.  Two neurosurgeons deemed him not to be a candidate for surgery.  R. 209.  The Claimant received a series of right L5-S1 selective nerve root blocks, and while they provided relief, he was unable to complete a work hardening program.  R. 209.

On September 7, 2001, Claimant sought treatment for back pain from Dr. Scott Robertson.  R. 252.  Dr. Robertson reported that Claimant's back pain was now only intermittent, and that his heel and toe walking, ankle and knee reflexes, and sensation in his feet were all normal.  R. 252.  He also reported that Claimant could squat and rise from a squat, but that straight leg raising was painful on his right side.  R. 232.  On September 13, 2001, Dr. Robinson noted that Claimant's back pain was 80 percent better, that his activity tolerance was essentially normal, and that he could resume normal activities.  R. 250-51.

On March 13, 2002, Claimant returned to Dr. Koehn complaining of an exacerbation of his right-sided problems.  R. 216.  On March 22, 2002, Claimant underwent an MRI, which found severe degenerative disc disease at L5-S1 with mild to moderate degenerative change in the L3-4, T11-12, and T12-L1 intervetebral disc which indented the ventral aspect of the thecal sac with no sign of neural impingement at that level, a leminectomny at the L5-S1 level with scarring around the S1 nerve root in the lateral recess, no sign of recurrent disc herniation, enhancement within the right L5-S1 neural foramen with some crowding of the L5 nerve foot in

the foramen which also appeared to be due to scarring, and no signs of recurrent disc herniation. R. 211. Dr. Koehn reported that the findings of the 2002 MRI had not significantly changed from previous MRIs. R. 216. During a followup visit on May 3, 2002, the Claimant reported persistent exacerbation and pain in the back, buttock, and lower extremities, weakness right greater than left, and numbness and paresthesia that had worsened. R. 216. Dr. Koehn noted that the Claimant reported recently mowing the grass for 3.5 hours, though the job took his son only one-half hour. R. 216.

On August 12, 2005, Dr. Robertson wrote a letter for the Claimant explaining that he would be incapable of performing jury duty because his degenerative disc disease caused pain that would make sitting for long periods of time difficult. R. 212.

On June 12, 2006, the Claimaint underwent another MRI. R. 397. According to a report prepared by Dr. Robert Kazan, the MRI revealed conditions that had worsened since his 1999 MRI, including a diffuse disc bulge at L5-S1, and a right foraminal disc protrusion causing compression of the right L5 nerve root. R. 399. Dr. Kazan also reported positive straight leg raising bilaterally at 40 degrees, reports of low back pain, an absent achilles reflex bilaterally and numbness in the S1 dermatome on the underside of the right big, 2nd, and 3rd toes, and weakness of plantar and dorsiflexion of both feet. R. 399.

In addition to back pain, the Claimant sought treatment for pain in his left elbow. In 1997, he suffered an elbow injury at work. Dr. John Sonnenberg operated on his elbow in March 1998, and after rehabilitation returned to work. R. 424. On June 30, 1999, the Claimiant returned to Dr. John Sonnenberg when the pain in his elbow returned. R. 424. Dr. Sonnenberg noted a severe case of lateral epicondilytis of the left elbow. R. 307. Dr. Sonnenberg gave the Claimant an injection for the pain, which along with a tennis elbow brace provided significant

relief by July 14, 1999.  R. 306.  By September 15, 1999, the elbow pain returned.  R. 306  Dr.

Sonnenberg treated the pain with another injection and recommended exercises to the Claimant.

R. 306.  But by December 6, 1999, Dr. Sonnenberg reported that persistent pain had returned

again despite a strenuous therapy program.  R. 306.  Dr. Sonnenberg noted tenderness over the

left elbow, full range of motion but only 60 percent grip strength compared to the right side, a

bone spur over the lateral epicondyle.  R. 306.  Dr. Sonnenberg again treated the Claimant with

an injection and advised the Claimant to wear his counter-force brace and to ice the elbow after

any lifting activity.  R. 306.

On February 21, 2000, Dr. Sonnenberg reported excellent progress and that the Claimant

felt 75 percent better and could do normal work.  R. 305.  But on December 31, 2003, Dr.

Sonnenberg reported that the Claimant had re-injured his elbow cutting wood.  R. 305.  Dr.

Sonnenberg treated the injury with a steroid injection and advised the Claimant to wear his

counter-force brace.  On January 14, 2004, Dr. Sonnenberg reported that the injection

had worked wonders and that the Claimant reported no pain.  R. 304.  On February 4, 2004, the

Claimant again injured his elbow using a chainsaw, which Dr. Sonnenberg treated with another

injection.  R. 304.

On March 23, 2006, state agency physician Dr. Frank Jimenez reviewed the record and

concluded that the Claimant could occasionally lift 20 pounds, frequently lift 10 pounds, sit for 6

hours in an 8-hour day, and stand/walk for 6 hours in an 8-hour day, and unlimited

pushing/pulling.  R. 389.  In support, Dr. Jimenez noted the Claimant's degenerative disc disease

and history of lumbar lamnectomies in 1985, 1993, and 1996, that MRIs revealed facet

degenerative changes, a crowding right L5 nerve root, scar tissue at the right S1 nerve, and

bilateral lumosacral radiculopathy.  R. 395.  He also noted a September 2001 report that although

the Claimant reported back pain, he has a normal range of motion, and a July 2005 report that the Claimant's back pain was stable. R. 395.

On December 14, 2007, Dr. Robertson completed an insurance company form on which he stated that the Claimant was unable to work since August 1999 due to back pain and hypertension. R. 404-05.

### D. ALJ's Decision

First, the ALJ found that the Claimant met the insured status requirements of the SSA through December 31, 2004. R. 16. Second, the ALJ found that the Claimant had not engaged in substantial gainful activity since August 13, 1999, through the date last insured. R. 16. Third, the ALJ found that the Claimant had the following severe impairments: (1) degenerative disc disease of the lumbar spine, and (2) epicondylitis of the left elbow. R. 16. Fourth, the ALJ found that these impairments did not meet or equal one of the listed impairments. R. 17. Fifth, the ALJ found that the Claimant had a residual functional capacity as follows: the Claimant could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk for a total of 6 hours during an 8-hour work day but required a sit/stand option in which he could alternate positions after 1 hour. R. 17.

In making her residual functional capacity determination, the ALJ found that although the Claimant alleged that back pain limited his ability to sit, stand, or walk for more than 30 minutes at a time, the allegations were not supported by the objective medical findings. R. 19. Specifically, the ALJ found that the clinical examinations showed normal range of motion and gait, predominantly intact neurological findings, and that although the Claimant reported a rotator cuff injury, there were no medical records to support it. R. 18-19. She further found that the Claimant's history of laminectomies by Dr. Kazan in 1993 and 1996 were followed by his

return to work. R. 19. She also noted that the Claimant did not immediately return to Dr. Kazan after he stopped working in 1999 and, instead, sought pain relief from Drs. Robertson and Koehn, and declined more advanced pain management strategies. R. 19. She noted that medical progress notes from 2001 and 2002 indicated that the Claimant was sitting/standing in the exam room in no apparent distress, that a straight leg test on April 11, 2001 was negative, and that he reported to Dr. Robertson on September 13, 2001 that his back pain was 80 percent better. R. 19. By January 4, 2005, after the last date insured, the Claimant reported that he was "feeling fine," and on July 26, 2005, Dr. Robertson noted that the Claimant's back pain was stable. R. 19-20. She also found that a medical record dated February 21, 2000, noted excellent progress in controlling the Claimant's elbow pain through the use of injections, and that the Claimant could return to normal work. R. 20.

The ALJ also found that the Claimant's daily activities, including cutting wood with a reciprocating saw that weighed 16 pounds, is consistent with light exertion, and that activities such as cutting wood, playing the guitar, and building models required a fair degree of concentration consistent with simple, routine tasks in a work setting. R. 20. She found that the Claimant's wife overstated his limitations, specifically, her statement that he spent most of the past 10 years lying down, which the ALJ found to be inconsistent with the Claimant's testimony about his daily activities. R. 20.

As for opinion evidence, the ALJ acknowledged that treating physician Dr. Robertson opined that the Claimant is unable to sit for long periods of time due to his degenerative disc disease and was unable to work. R. 20. However, she rejected the opinion that the Claimant could not work as a legal, not medical, conclusion, and found that a sit/stand option accommodates the claimant's pain. R. 20-21. Rather, she found that state agency Dr. Jimenez's

opinion that the Claimant could lift/carry 20 pounds occasionally and 10 pounds frequently, could stand/walk for about 6 hours and sit for about 6 during an 8-hour workday, and could perform unlimited pushing/pulling was "well supported by the medical findings, including the MIRs and exams discussed earlier in this decision," and therefore was entitled to significant weight. R. 21.

Finally, the ALJ concluded that results from the 2006 MRI were probative of the Claimant's condition only after the date last insured. R. 18.

## II.     LEGAL STANDARDS

### A.     Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g). This much is clear regarding the standard of review. If supported by substantial evidence, the Commissioner's factual findings are conclusive. 42 U.S.C. § 405(g). If the Appeals Council denies a request for review, the ALJ's decision becomes the Commissioner's final decision, reviewable by the district court. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). But beyond these axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, court opinions have held that the standard of review is narrow. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is "extremely limited"). The district court's review is limited to determining whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standard in reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion

is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, on review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v. Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004). Moreover, a decision need not provide a complete written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). If reasonable minds could differ concerning whether a claimant is disabled, then the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful to emphasize that the review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For example, a "mere scintilla" is not substantial evidence. *Id.* Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the

evidence to the conclusion.  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).[2]  And, unlike

most civil litigation in which a decision can be affirmed on any basis in the record, federal courts

cannot do so in Social Security appeals.  *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir.

2010) ("[T]he Chenery doctrine . . . forbids an agency's lawyers to defend the agency's decision

on grounds that the agency itself had not embraced."), *with Brosted v. Unum Life Ins. Co.*, 421

F.3d 459, 467 (7th Cir. 2005) ("[W]e can affirm on any basis in the record").  Therefore, the

Commissioner's counsel cannot build for the first time on appeal the necessary accurate and

logical bridge.  *See Parker*, 597 F.3d at 925; *Toft v. Colvin*, No. 08 CV 2861, 2013 U.S. Dist.

LEXIS 72876, *21 (N.D. Ill. May 23, , 2013) ("[T]he court's review is limited to the reasons and

logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the

Commissioner's brief.").

### B.    Disability Standard

Disability insurance benefits are available to a claimant who can establish that he is under

a "disability" as defined in the SSA.  *Liskowitz v. Astrue*, 559 F.3d 736, 739-740 (7th Cir. 2009).

"Disability" means an "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected . . . to last for a

continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is

under a disability if she is unable to perform her previous work and cannot, considering her age,

---

[2]To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  But the "logical bridge" analysis was never meant to compel a hypercritical approach. *Mueller v. Astrue*, 860 F. Supp. 2d 615, 619 (N.D. Ill. 2012).  Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge:  "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger*, 516 F.3d at 544.

education and work experience, participate in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. § 404.1572(b).

The ALJ uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i - v). Under this analysis, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's residual functional capacity ("RFC"); and (5) whether the claimant is capable of performing work in light of the claimant's age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740. After the claimant has proved that she cannot perform her past relevant work due to the limitations, the Commissioner carries the burden of showing that a significant number of jobs exist in the national economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III.    DISCUSSION

### A.    Contentions of the Parties

In asserting that the ALJ's decision was not supported by substantial evidence, the Claimant contends that the matter should be remanded for three primary reasons. First, the Claimant contends that because he proceeded *pro se* at the hearing, the ALJ was obligated to fully develop the record, but failed to (1) request records of the work hardening program he was unable to complete, (2) contact Dr. Robertson to further explain the basis of his conclusion that the Claimant was unable to work, and (3) request records of the Claimant's rotator cuff injury.

Second, the Claimant contends that the ALJ erred by finding his elbow injury to be a severe impairment, but not including any limitations into the RFC. Third, the Claimant contends that the ALJ erred by failing to support the portion of the RFC that found him able to stand and walk for up to 6 hours in an 8-hour day.

The Commissioner contends that the ALJ's conclusion was supported by substantial evidence and should be affirmed.

**B.      Analysis**

**1.      Development of the Record**

The Claimant argues that the ALJ erred by failing to obtain additional medical evidence that would have supported his claim. When a claimant proceeds *pro se* at his hearing, the ALJ has a heightened duty to develop the record. For a *pro se* claimant, "the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts . . . . Although *pro se* litigants must furnish some medical evidence to support their claim, the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information." *Nelms*, 553 F.3d at 1097-98 (internal citations and quotation marks omitted). Although the "reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation" is generally upheld, the ALJ must nevertheless seek out records of known treatments where the absence of those records is significant and could be prejudicial. *Id.* at 1098-99.

First, the Claimant contends he was prejudiced by the ALJ's failure to obtain records from the work hardening program he was unable to complete. The Commissioner responds that the ALJ met her obligation to develop the record by eliciting from the Claimant that he was

unable to complete the program due to difficulty climbing ladders and stairs, and lifting more than 10 or 15 pounds.  However, had the ALJ also obtained the report prepared by physical therapist Curtis Hutson after treating the Claimant during 16 sessions over the course of 4 weeks, which the Claimant provided to the Appeals Council, the ALJ would have learned the additional following information:

> limiting factor is RLE [right lower extremity] radicular symptoms. Subjective complaints correlated well with RLE gait pattern, decreased pace, facial grimacing, intermittent seated rests, intermittent trunk forward bent with bilateral UE [upper extremity] support rest breaks, and occasional rubbing of RLE that were observed at the time complaints were offered and even when the client was unaware he was being observed.

R. 414.  As the Claimant notes, the treatment notes might have supported a different RFC determination given the observed seated rests that supported a need for rest breaks, which might have limited the Claimant to sedentary, rather than light, work.  Given the vocational expert's testimony that an ability to stand for a total of only 2 hours per day would have precluded the Claimant from performing the jobs identified at the hearing, the Claimant may have been prejudiced by the ALJ's failure to seek out the work hardening treatment notes.  *See Nelms*, 553 F.3d at 1098 (ALJ erred by failing to seek records that, if considered, would have supported a finding of disability).  Thus, the ALJ erred by not seeking out notes about treatment she knew occurred and that might have affected her RFC determination.

Second, the Claimant contends that the ALJ erred by rejecting Dr. Robertson's opinion that he was unable to work without first seeking additional information from Dr. Robertson about the basis for his opinion.  The ALJ did "not give[] much weight" to the opinion that the Claimant could not work because it was "not a medical opinion, but rather a legal conclusion on an issue reserved to the Commissioner" and because he "did not provide a function by function analysis, so his basis for concluding the claimant is 'unable to work' is not explained."  R. 21.

The Commissioner contends that the ALJ did not err for two reasons.  First, it contends that the ALJ was entitled to reject Dr. Robertson's opinion because it was a legal conclusion reserved to the Commissioner.  However, SSR 96-5p requires that the ALJ "make every reasonable effort to recontact [treating] sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear."  Thus, the ALJ was not free to reject Dr. Robertson's opinion solely because it was on an issue reserved to the Commissioner.

Second, the Commissioner contends that the ALJ was not required to recontact Dr. Robertson because he explained the basis of his opinion as being "back pain and hypertension."  But it was the ALJ who concluded that the opinion was "not explained" because it lacked a "function by function analysis."  The Commissioner cannot rely on a reason—that Dr. Robertson explained the reason for his opinion—that is opposite to the reason given by the ALJ in her decision.  *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("it would displace the responsibility that Congress has delegated to the Social Security Administration" to allow the Commissioner to substitute on appeal arguments missing from the ALJ's decision denying benefits).  According to the Claimant, the function-by-function analysis the ALJ concluded was missing from Dr. Robertson's opinion is set out in responses to a Physical Residual Functional Capacity Questionnaire Dr. Robertson completed on April 21, 2009, and that the ALJ should have asked Dr. Robertson for a function-by-function analysis before issuing her decision.  By failing to seek the basis for Dr. Robertson's opinion on an issue reserved to the Commissioner as required under SSR 96-5p, the ALJ erred.

Third, the Claimant contends that the ALJ erred by failing to seek records regarding his rotator cuff injury.  The Commissioner responds that the ALJ satisfied her duty to develop the

record by asking how long his rotator cuff had bothered him, to which he replied about 4 years. But the ALJ never asked if the Claimant sought treatment for the injury or if he had relevant medical records before deciding against incorporating any limitations brought on by the injury because the "record does not document a rotator cuff injury." R. 18. On appeal, the Claimant has not identified what medical records documenting his rotator cuff injury exist, and therefore has not provided the court with a basis for concluding that the ALJ's failure to seek out records prejudiced him. *See Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994) ("Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand."). However, even though his argument regarding his rotator cuff injury may not provide an independent basis for a remand, because his application is being remanded for other reasons, the ALJ will have another opportunity to further develop the record.

### 2. No Limitation Included in RFC for Severe Elbow Impairment

Next, the Claimant argues that the ALJ erred by failing to incorporate into the RFC limitations on his gross or fine manipulation due to the epicondylitis of his left elbow. The Claimant argues that it was illogical for the ALJ to determine that the impairment to his left elbow was severe, but to incorporate no limitations into her RFC determination. However, "a severe limitation does not necessarily require any limitation." *Taloff v. Astrue*, No. 12 CV 1696, 2013 WL 1499027, at *10 (N.D. Ill. Apr. 11, 2013). Where an ALJ has offered a sufficient explanation why she included no limitation for a severe impairment, the ALJ has not erred. *Id.* Here, the ALJ observed the following about the medical evidence of the Claimant's elbow pain:

> medical progress notes dated February 21, 2000 indicate that the
> claimant had made excellent progress with the use of injections.
> Furthermore, Dr. Sonnenberg indicated that from the elbow
> standpoint the claimant could return to normal work (Exhibit 2F,
> page 10). Additionally, a review of the medical evidence indicates
> that the claimant received minimal treatment after his alleged onset
> date of disability.

R. 20.  The Claimant does not acknowledge the ALJ's explanation, and does not argue that the

ALJ's observations do not sufficiently explain why she included no elbow-related limitations

into the RFC.  Accordingly, the Claimant has offered no basis for concluding that the ALJ erred

by not including in the RFC limitations regarding his elbow impairment.

### 3. Support for Conclusion that Claimant Could Stand and Walk for Up To 6 Hours of an 8-Hour Day

Next, the Claimant contends that the ALJ erred by failing to support her conclusion that

his RFC included the ability to stand and walk for up to 6 hours in an 8-hour day.  The Claimant

argues that the ALJ made five errors in reaching that conclusion:  (1) she did not properly weigh

competing opinion evidence; (2) she did not discuss evidence that supported the Claimant's

reports of disabling pain; (3) she did not explain how occasional wood chopping supported her

determination that the Claimant could perform full-time light work; (4) she made improper

medical determinations; and (5) she made improper credibility determinations.

### a. Opinion Evidence

The Claimant argues that the ALJ failed to properly weigh the opinion of his treating

physician, Dr. Robertson, against the opinion offered by state agency physician Dr. Jimenez.

The ALJ gave "no special weight" to Dr. Robertson's opinion that the Claimant could not work

because it was a legal issue reserved for the Commissioner and because Dr. Robertson failed to

include a function-by-function analysis to support his conclusion.  R. 21.  The ALJ gave

"significant weight" to the opinion of Dr. Jimenez that the Claimant could lift/carry 20 pounds

occasionally and 10 pounds frequently, could stand/walk for about 6 hours during an 8-hour day,

could sit for about 6 hours during an 8-hour day, and could perform unlimited pushing/pulling.

R. 21.  The ALJ found that the opinion of Dr. Jimenez was "well supported by the medical

findings, including the MIRs and exams discussed earlier in the decision."  R. 21.

When faced with conflicting opinions, an ALJ must weigh the opinions by applying the factors set out in 20 CFR 404.1527(c), which includes the following: (1) whether the doctor examined the claimant; (2) whether the doctor established a treating relationship with the claimant; (3) the nature of the treating relationship including its length and the frequency of treatments; (4) the support offered for the opinion; (5) the consistency with the record; and (5) the doctor's area of specialization. The ALJ did not acknowledge these factors or explicitly purport to apply them. The Commissioner argues that an application of the factors favors the opinion of Dr. Jiminez and, therefore, the ALJ's decision to weigh his opinion more heavily than the opinion of Dr. Robertson is supported by the record. For instance, it notes that Dr. Jiminez's opinion noted medical records that show the Claimant had degenerative disc disease that required surgery in 1985, 1993, and 1996; an MRI that shows facet degenerative changes with crowding of the L5 nerve root and scarring of the S1 nerve root; and reports of back pain with positive straight leg raising; but a normal range of motion and intact neurological findings; and a report from Dr. Robertson that the Claimant's back pain was stable in July 2005. In contrast, the Commissioner contends that Dr. Robertson's opinion noted only herniated discs and did not cite any MIR or EMG results, surgical treatments, or physical examinations.

The ALJ must build the logical bridge between the evidence and her conclusions within her decision. *See Toft*, 2013 U.S. Dist. LEXIS 72876, *21. The Commissioner may not build that bridge for the first time on appeal. *Id.* ("[T]he court's review is limited to the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief."). In her decision, the ALJ found only that Dr. Jimenez's opinion was "well supported by the medical findings, including the MRIs and exams discussed earlier in this decision." R. 21. She did not identify which medical findings were more consistent with Dr.

Jiminez's opinion rather than Dr. Robertson's or in what way. Furthermore, as discussed above, she did not seek out the function-by-function analysis that she noted was missing from Dr. Robertson's report that might have supported his opinion. *Nelms*, 553 F.3d at 1097-98 (for claimants proceeding *pro se*, the ALJ is required to supplement the record as necessary by contacting treating physicians to request additional records and information).

By failing to articulate how the factors set out in 20 C.F.R. § 404.1527(c) weighed in favor of Dr. Jiminez's opinion rather than Dr. Robertson's, and by failing to seek out the function-by-function analysis she found missing from Dr. Robertson's opinion, the ALJ erred by failing to build a logical bridge between the evidence presented and her decision to give significant weight to Dr. Jiminiez's opinion and no special weight to Dr. Robertson's.

### b. Claimant's Favorable Evidence

Next, the Claimant contends that the ALJ ignored evidence favorable to his claim. First, he argues that the ALJ relied on a EMG/NVC report dated January 25, 2000, that revealed no evidence of radiculopathy in the right lower extremity to support her RFC that the Claimant could stand and walk for 6 hours a day, but ignored evidence of pain independent of radiculopathy. R. 18. Specifically, the Claimant asserts that the ALJ ignored a note in the same EMG/NVC report of local denervation in L5-S1 paraspinal region on the right side compared to the left side which could have been related to scarring or irritation on local paraspinal nerve branches to the muscles. R. 206. The Claimant contends that the ALJ failed to explain why the report of local denervation was not an independent source of numbness, weakness, and leg pain that could have impacted how long he could stand and walk. The Commissioner responds by identifying other medical evidence it contends undermines the Claimant's allegations of disabling pain attributable to local denervation. However, as discussed above, the logical bridge

between the record evidence and the ALJ's conclusion must be built by the ALJ in her decision, not by the Commissioner on appeal. *See Toft*, 2013 U.S. Dist. LEXIS 72876, *21. In citing the January 25, 2000, the ALJ discussed only the portion that found no radiculopathy, and did not discuss the significance of the finding in the same report that the EMG/NCV also found local denervation at L5-S1 on the right side. Although the ALJ is not required to address every piece of medical evidence presented, an ALJ fails to build a logical bridge supporting her decision when she fails to address evidence that could support a Claimant's allegations. *See Hanson v. Astrue*, No. 10 CV 500, 2012 WL 266381, at *13 (N.D. Ill. Jan. 30, 2012). Accordingly, the ALJ erred by failing to build the logical bridge between that evidence and the conclusions she drew in her RFC determination.

### c.      Support for Light Exertion Work

Next, the Claimant contends that the ALJ failed to explain how evidence of his chopping wood supported her conclusion that he could perform light exertion work. In her decision, the ALJ discounted the Claimant's allegations that his activities were limited based, in part, on evidence that he chopped wood with an ax and with a chainsaw that weighed about 16 pounds. The ALJ found that "cutting wood is an activity that seems generally consistent with light exertion." R. 20. The Claimant contends that the ALJ reached this conclusion without any supporting medical evidence, and without accounting for the fact that the Claimant repeatedly injured himself while attempting to cut wood.

The Commissioner responds that the Claimant "misses the point" of the ALJ, who determined only that the Claimant's testimony that he was able to lift a 16-pound chainsaw to cut wood undermined his allegation that he could lift no more than 10 pounds. However, the ALJ did not offer evidence of lifting a 16-pound chainsaw as evidence bearing on credibility but,

rather, explicitly stated that she used it as evidence "consistent with light exertion." R. 20. In making an RFC determination, an ALJ must consider "'the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.'" *Allen v. Astrue*, 869 F. Supp. 2d 924, 938 (N.D. Ill. 2008) (quoting notes to SSR 96-8p). The ALJ did not cite evidence to support her conclusion that occasional wood chopping that left the Claimant injured supported an RFC determination that he could perform light exertion work on a regular and continuing basis. Because the ALJ relied on the evidence of wood chopping as the support for her determination that the Claimant could perform light work, her determination is not supported by substantial evidence.

### d. Medical Determination Regarding 2006 MRI

The Claimant contends that the ALJ further erred by concluding that his 2006 MRI was "not probative of the claimant's condition during the time period under consideration," and that the more advanced disc protrusion revealed by the MRI "suggests a deterioration in the claimant's status after the date last insured," which was December 31, 2004. R. 18. The Claimant argues that because the ALJ is not a medical doctor, she was unqualified to conclude that the 2006 MRI shed no light on his condition during the period insured.

"As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996). The ALJ did not rely on medical evidence in concluding that the 2006 MRI was not relevant to the Claimant's condition during the insured period and, instead, made that determination for herself. Nevertheless, the Commissioner argues that ALJ was entitled to make that determination because the 2006 MRI showed only slight changes to the Claimant's condition, it "offered little in the way of valuable evidence." But, again, no medical

evidence supports the conclusion that the 2006 MRI offered no insight into the Claimant's condition during the insured period, and case law suggests that post-insured evidence may be relevant. *See, e.g., Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006) ("A disease might have a well-understood progression, so that a physician examining a patient at time *t* might have a good idea of what the patient's condition had been at time *t*—*n*, where *n* was the number of years, prior to the examination, by which time the patient would have had to be completely disabled to be entitled to benefits."). Accordingly, the ALJ's decision to discount the findings of the 2006 MRI was erroneous because it was not supported by substantial evidence.

### e.       Credibility Determinations

Next, the Claimant argues that the ALJ did not properly evaluate evidence of his daily activities before determining that testimony about those activities from him and his wife was not credible. The ALJ found that the Claimant's testimony about his daily activities, including cutting wood, building model airplanes, and playing guitar, did not support his allegations that his daily activities are limited. The court previously discussed the ALJ's reliance on evidence that the Claimant cut wood. As for evidence that he built models and played guitar, the evidence came from the Claimant himself, and the ALJ relied on it only to support her conclusion that he could perform simple, routine tasks. The Claimant has not argued that the portion of the RFC limiting him to simple, routine tasks was erroneous, and therefore has not shown that the ALJ's determination as to this portion of the RFC lacked substantial evidence.

As for the testimony of the Claimant's wife, the ALJ found that his wife was overstating when she testified that he spent most of his time over the last 10 years lying down. R. 20. The ALJ supported her finding with testimony from the Claimant about the activities in his daily life, which included testimony about his work history, work around the house, and hobbies including

playing guitar and building models. R. 20. An ALJ's credibility determinations are entitled to special deference, and will be overturned only if patently wrong. *See Schomas v. Colvin*, — F.3d —, No. 13-1197, 2013 WL 5485143, at *7 (7th Cir. Oct. 3, 2013). The Claimant argues that the ALJ's credibility determination cannot stand because his own statements that he spent 18 out of 24 hours reclining on his side, which leaves 6 hours each day in which he could have performed the activities he described. But the Claimant made that statement on March 3, 2006 about his then-current daily activities. R. 165-73. It does not undermine that ALJ's determination that his wife's testimony about his activities over the past 10 years, which included times when he was employed, was overstated. Accordingly, the Claimant has not established that the ALJ's determination was patently wrong.

## IV. CONCLUSION

For the reasons stated above, the Commissioner's motion for summary judgment is denied, and the Claimant's motion for summary judgment is granted in part as follows: the request for a remand with instructions to award benefits is denied, while the request for a remand for additional proceedings consistent with this order is granted. The matter is remanded to the Commissioner.

It is so ordered.

Date: November 6, 2013     By: _____
                                   Iain D. Johnston
                                   U.S. Magistrate Judge